

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA

          Plaintiff,

vs.

MALCOM MARTIN,

          Defendant.

Case No. 3:26-mj-00158-KFR

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Michael Harkless, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is submitted in support of a criminal complaint against MALCOM MARTIN (MARTIN) for violating 49 U.S.C. § 46504 – Interference with Flight Crew Members and Attendants.

2. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

//

//

//

//

3. I am a Special Agent with the Federal Bureau of Investigation. I have been an SA with the FBI for approximately four years. I am currently assigned to the Violent Crime Squad in the FBI's Anchorage Field Office. Prior to employment with the FBI, I served as an active-duty Army officer from May 2011 to January 2022.

4. As part of my FBI duties in the VC Squad I investigate and assist with investigations in criminal violations of federal law, to include federal sex trafficking and prostitution offenses, racketeering offenses, bank robberies, firearms violations, and the Controlled Substances Act. I also serve as one of Anchorage FBI's airport liaisons and respond to investigate violations on board aircraft that fall under federal jurisdiction.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not set forth all my knowledge about this matter.

## RELEVANT STATUTES AND REGULATIONS

6. The relevant statutory authority and terms used in this affidavit and its attachments are described and defined below.

    a. 49 U.S.C. § 46504, states: "An individual on an aircraft in the special aircraft jurisdiction of the United States who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties,

*Affidavit in Support of Criminal Complaint*
3:26-mj-00158-KFR                    Page 2 of 8
Case 3:26-cr-00029-SLG-KFR    Document 1-1    Filed 03/16/26    Page 2 of 8

or attempts or conspires to do such an act, shall be fined under title 18, imprisoned for not more than 20 years, or both. However, if a dangerous weapon is used in assaulting or intimidating the member or attendant, the individual shall be imprisoned for any term of years or for life."

## INVESTIGATION AND PROBABLE CAUSE

7. On March 14, 2026, at approximately 7:25 p.m., Anchorage FBI was notified of a disturbance on Delta Flight 69 that caused the flight to divert to Anchorage. The flight was travelling from Seattle to Taiwan and was midflight when the disturbance occurred. I was notified and responded to Ted Stevens International Airport (Airport) in Anchorage, AK. Initial reporting stated a fight erupted on the flight involving a passenger, later identified as MALCOLM MARTIN, and that a flight attendant may have been struck.

8. I contacted Anchorage Airport Police and Fire (AAP) Officer Larson. AAP Officers would meet the aircraft at the gate, detain the passenger for potential interview, and conduct initial interviews of witness passengers and flight crew.

9. I arrived at the airport and received an initial brief of events from AAP. AAP detained MARTIN on the aircraft, placed him into handcuffs, and walked MARTIN to AAP's custodial interview room. AAP did not read MARTIN his *Miranda* rights and did not ask MARTIN any questions or speak to him during the detention. AAP stated MARTIN asked for a lawyer during the detention and was otherwise compliant.

10. From AAP's initial interviews of flight crew members and witness passengers, AAP summarized that a verbal altercation occurred between MARTIN and Victim Flight Attendant One (V-1). During the verbal altercation, MARTIN made racial

slurs and V-1 made antagonizing comments back to MARTIN in response. Additionally, during the verbal altercation MARTIN threatened to fight and kick V-1's "ass" once the plane landed. Finally, MARTIN at some point "swung" at the flight attendant. However, no one was physically struck or touched during the altercation. MARTIN had several alcoholic drinks during the flight and was described by witness passengers as an "asshole" before boarding the plane.

11.     AAP officers and I conducted follow-up interviews with several members of the flight crew. Additionally, AAP collected several videos witness passengers took of the verbal altercation.

12.     I interviewed V-1 on board DL 69. V-1 was an older black male. V-1 was also approximately six feet tall and appeared to be physically fit. V-1 stated he was standing in the galley eating a meal when MARTIN forcefully grabbed his shoulder to get V-1's attention. V-1 turned and saw MARTIN who asked in a disrespectful tone if the bathroom was occupied. There was a bathroom adjacent to the galley. V-1 responded in a dismissive manner, explaining to MARTIN that when the locked indicator was shown on the door it meant the latrine was occupied. V-1 turned back to continue eating his meal. MARTIN made several additionally disrespectful comments. The bathroom became available at some point and MARTIN entered. After several minutes in the bathroom MARTIN exited and again made disrespectful comments towards V-1. V-1 did not like how MARTIN was speaking to him and responded in a similarly disrespectful manner to MARTIN. A heated verbal argument ensued in which MARTIN called V-1 a "nigger," stated V-1 was only

treating MARTIN that way because MARTIN was white, and made several threats to kick V-1's "ass" once the plane landed.

13. At this point Victim Flight Attendant number two (V-2) interjected to make several statements to me. V-2 was initially in the galley with V-1 when the initial verbal altercation occurred. When MARTIN exited the latrine he continued the verbal altercation with V-1, the escalation became large enough that several passengers moved to the galley to attempt to de-escalate the conflict. V-2 notified the cockpit that a level two disturbance was occurring. However, the verbal altercation became so heated between MARTIN and V-1 that V-2 quickly escalated the disturbance to a level three and retrieved restraints for MARTIN. V-2 placed himself in between V-1 and MARTIN and was trying to de-escalate the situation. V-2 told MARTIN repeatedly to please return to his seat. V-2 was physically impeding V-1 from closing distance with MARTIN. Other passengers were physically around MARTIN preventing him from closing distance with V-1. MARTIN then swung towards V-2 but did not physically connect. MARTIN eventually returned to his seat and was not placed into restraints.

14. I interviewed the four pilots on the plane. Pilots Vincent Mancuso and Michael Phillips were in the cockpit when the disturbance was relayed to them. The disturbance was quickly elevated to level three which required the cockpit to be locked. While coordinating with Delta Airlines Corporate Office via satellite phone and the rest of the flight crew who were witnessing the disturbance, the decision was made to divert to Anchorage. Mancuso and Phillips then began to conduct procedures for the diversion which included calculating new landing procedures for an overweight aircraft. I know from

previous pilot interviews that diverted aircraft normally are overweight with fuel intended for their original trip. This required the pilots to conduct and verify new landing procedures for the aircraft's weight and runway at Anchorage to ensure a safe landing.

15.     Pilots Timothy Johnson and Jason Snook were in the pilot's rest bunks at the time of the disturbance. The disturbance escalated so rapidly to level three that the cockpit was locked before either of them could return to the cockpit. Johnson went back to the galley to assess the disturbance and witnessed the verbal altercation. Johnson stated the altercation was severe and thought MARTIN and V-1 were going to come to physical blows. Johnson saw MARTIN at one point lunge towards V-1. Johnson did not see MARTIN swing at V-1 or V-2.

16.     AAP collected several videos of the disturbance between MARTIN and V-1. I conducted a cursory review of several of the videos with AAP. In the videos I could see MARTIN standing at the entrance to the galley. MARTIN made several heated exchanges with individuals not seen on screen. MARTIN made several body movements near the galley. The movements were quick and short in distance and appeared similar to how someone's body would be animated in a heated discussion. I did not observe a lunge or swing by MARTIN during the cursory review.

17.     AAP Officer Larson and I then returned to AAP's custodial interview room and introduced themselves to MARTIN. I informed MARTIN that because of the disturbance and flight being diverted to Anchorage the FBI was notified. I advised MARTIN of his *Miranda* rights. I stated AAP had informed me that MARTIN initially asked for a lawyer earlier. I asked if MARTIN still wanted a lawyer or if MARTIN would

*Affidavit in Support of Criminal Complaint*
3:26-mj-00158-KFR                    Page 6 of 8
Case 3:26-cr-00029-SLG-KFR    Document 1-1    Filed 03/16/26    Page 6 of 8

like to talk with me. MARTIN stated he wanted to talk with me. AAP's custodial interview room was recorded via AAP's recording equipment, and the interview was also captured via Officer Larson's body camera. However, given that MARTIN previously invoked his right to counsel during his initial interview with AAP, and there was no break in custody of at least 14 days, I have not included any of his statements in this affidavit.

18.     After the interview MARTIN was advised he was being placed under arrest for interference with a flight crew. MARTIN was transported to and remanded at Anchorage Correctional Complex. The arrest, transport, and remand were recorded via Officer Larson's body worn camera.

19.     Assistant U.S. Attorney Christopher Schroeder reviewed this affidavit prior to its submission to the Court.

## CONCLUSION

20.     Based upon the information above, I submit that there is probable cause to believe that on March 14, 2026, MALCOM MARTIN's actions violated 49 U.S.C. § 46504 – Interference with Flight Crew Members and Attendants. Specifically, there is probable cause to believe that MARTIN's threats and intimidation to V-1 led to several passengers intervening to de-escalate the situation, and several flight crew members, including a pilot, to deem the situation enough of a security threat that the cockpit had to be locked, restraints retrieved, and caused the aircraft be diverted.

//

//

//

Respectfully submitted,

*Michael Harkless*

Michael Harkless
Special Agent
Federal Bureau of Investigation


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 on

May 16, 2026

HON. MATTHEW M. SCOBLE
U.S. Magistrate Judge
DISTRICT OF ALASKA

*Affidavit in Support of Criminal Complaint*
3:26-mj-00158-KFR                    Page 8 of 8
Case 3:26-cr-00029-SLG-KFR    Document 1-1    Filed 03/16/26    Page 8 of 8